IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IRENE THOMAS,<br><br>    Plaintiff,<br><br>  v.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security,<br><br>    Defendant.<br>                                                      / | No. C 07-06059 WHA<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT** |

**INTRODUCTION**

In this social security appeal, this order finds that neither the administrative law judge nor the Appeals Council erred in the decision to deny benefits to plaintiff. Accordingly, plaintiff's motion for summary judgment is **DENIED** and defendant's cross-motion for summary judgment is **GRANTED**.

**SUMMARY**

Plaintiff asserts she was wrongly denied benefits due to the ALJ's failure to (i) accurately reflect the medical evidence; (ii) properly evaluate her reported cervical neck strain as a severe impairment; (iii) properly credit her testimony; (iv) properly assess her residual functional capacity; and (v) pose a legally adequate hypothetical to the vocational expert. As detailed in this order, and summarized below, plaintiff is mistaken that the ALJ erred in these respects.

As to the reflection of medical evidence, the ALJ need not discuss every piece of evidence in interpreting and developing the record. Nonetheless, the ALJ did discuss the opinions of the physicians cited by plaintiff. Furthermore, these opinions were consistent with the ALJ's ultimate determination that plaintiff could not perform her past work. Finally, with respect to the opinions issued in August 2002, even had the ALJ accorded them little weight, he would have been justified in so doing as they predated plaintiff's alleged onset date of disability.

As to the neck pain, that plaintiff reported the impairment does not mean the ALJ had to find it severe. Instead, the burden was on plaintiff to prove medically-severe impairments substantially limiting her ability to work. Moreover, in evaluating plaintiff's proffered proof, the ALJ need not have accepted any physician's opinion, regardless of whether it was contradicted. Here, the ALJ assessed plaintiff's subjective reports and her physician's opinions and cited substantial evidence to support his conclusion that the reported functional limitations were at most de minimis.

As to the subjective testimony, the ALJ is responsible for determinations of credibility; thus, where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be upheld. Here, the ALJ properly gave specific, clear and convincing reasons for rejecting plaintiff's allegations of disabling symptoms. It was within the ALJ's authority to interpret this evidence as grounds for discrediting plaintiff's testimony of subjective symptoms.

As to the residual functional capacity, plaintiff asserts the ALJ ignored her need for periodic breaks, the limitations imposed by her neck pain, and her subjective testimony. Regarding the periodic breaks, this need is not inconsistent with any job. Regarding the neck pain and subjective testimony, because the ALJ appropriately found the neck pain non-severe and articulated specific, clear and convincing reasons for discrediting the subjective testimony, he need not have included either in his analysis of plaintiff's residual functional capacity.

As to the hypothetical, because it included all of the limitations that the ALJ found credible and supported by substantial evidence in the record, it was properly posed. Further, that plaintiff is of limited English proficiency is inconsistent with neither the vocational expert's

1  conclusions nor the ALJ's ultimate determination in reliance thereon.  Lastly, contrary to
2  plaintiff's assertion, the ALJ did direct the vocational expert to alert him when giving titles of
3  jobs that conflicted with those in the Dictionary of Occupational Titles and the vocational expert
4  acted accordingly.

**STATEMENT**

**1.    PROCEDURAL HISTORY.**

On January 22, 2004, plaintiff Irene Thomas applied for disability insurance benefits, alleging an onset of disability since September 23, 2002, due to bilateral carpal tunnel syndrome, wrist tendinitis de Quervain's tenosynovitis, and bilateral, lateral medial epicondylitis (AR 70–72, 108).  Plaintiff was insured through at least December 31, 2007 (*id.* at 20, 91–92). Her application was denied both initially (*id.* at 29–32) and upon reconsideration (*id.* at 34–39). An administrative hearing was timely requested (*id.* at 40).

On January 9, 2006, plaintiff had a hearing before ALJ Steven B. Berlin (*id.* at 547–75). The ALJ rendered a decision on July 21, 2006, finding plaintiff was not disabled (*id.* at 16–24). Plaintiff requested administrative review (*id.* at 14–15).  The Appeals Council denied the request (*id.* at 5–7).  Plaintiff filed this action on May 6, 2008, seeking judicial review pursuant to 42 U.S.C. 405(g).  The parties now make cross-motions for summary judgment.

**2.    TESTIMONY AT THE ADMINISTRATIVE HEARING.**

Before the ALJ, plaintiff testified with the assistance of interpreter, Eduardo Cabrera (*id.* at 549).  Plaintiff stated she last worked in September 2002 at Fidelity National Management where she sorted documents (*id.* at 552–53).  This was when her physical problems began.  At first, plaintiff explained, her thumb was nearly stiff.  Then, she could no longer move it.  Plaintiff reported the disability to her employer and her employer sent her to a doctor.  The doctor gave her an injection (*id.* at 558).  The doctor also told plaintiff to rest every hour.  Plaintiff noted this meant she should work for 45 minutes then rest for 15 minutes (*id.* at 564).  Plaintiff did so for three months (*id.* at 558, 564).  She then told Fidelity National Management she was unable to continue (*id.* at 558) because she could no longer move her left thumb (*id.* at 555).

Earlier, plaintiff worked at St. Michael Convalescent Hospital where she served food in the kitchen and washed clothes (*ibid.*). Plaintiff also worked at the convalescent hospital, Vintage Estates of Hayward, found work through the employment agency, Spectrum Personnel, worked at a printing press, Treasure Chest Advertising, and was a jewelry packer for a short time (*id.* at 555–57, 566–67).

Plaintiff testified that she underwent three surgeries, the first for her left-hand carpal tunnel syndrome, the second for her right-hand carpal tunnel syndrome, and the third for her thumb (*id.* at 558–59). Plaintiff said she was also treated with physical therapy and acupuncture (*id.* at 559). Plaintiff stated she was not doing better at the time of the hearing and that pain continued in her hands and neck (*id.* at 559–60). She said she could do everything but the pain in her hands was always there (*id.* at 560).

Plaintiff testified that on a normal day, she would get up, take a shower, prepare her food, and have breakfast (*ibid.*). She would go out for a short walk lasting about an hour (*id.* at 560, 563). Plaintiff would do the therapy recommended by the doctor (*id.* at 560). She did exercises for her hands in the morning, afternoon, and night (*id.* at 565). She used "machines, electrodes" three times a day for fifteen-to-twenty minute intervals (*id.* at 560, 565). At night, plaintiff used an ice pack on her neck (*id.* at 560).

Plaintiff testified that she went grocery shopping with her husband, that her husband helped her to prepare the food, and that she and her husband did the laundry together (*id.* at 561). Plaintiff stated she used her computer very little, but only to read emails and write seven or eight lines in reply (*id.* at 562).

Plaintiff testified that she used Carisoprodol to relax her muscles and Ibuprofen as an anti-inflammatory (*ibid.*). The drugs helped a little, but sometimes made her stomach hurt and Carisoprodol made her sleepy (*id.* at 562–63). Plaintiff said the surgery on her left hand helped at first, but it had been two years and the pain was still there. The same was true of her right hand. Her thumb, though, was better and she was able to move it (*id.* at 563). Plaintiff indicated her neck pain was the worst problem she had, at the time of the hearing (*id.* at 560). Plaintiff said her hands were hurting as the hearing was being conducted (*id.* at 564).

4

Vocational expert, Malcolm Brodzinsky, also testified at the hearing. In response to hypothetical questions posed by the ALJ, he concluded plaintiff could not perform any of her past work, but that should could perform other jobs existing in the local and national economies. Specifically, she could work as a machine tender in textiles (*id.* at 572–73).

### 3. MEDICAL EVIDENCE.

The medical evidence was summarized in the ALJ's decision (*id.* at 19–24). This order will also briefly review both plaintiff's self-reported symptoms and the findings of each physician who examined her.

From July through October 2002, plaintiff was treated by Medical Express Family Practice (*id.* at 159–73). She was prescribed Lodine for pain in her left thumb, left thumb tendinitis, and first metacarpal arthritis (*id.* at 160–73).

On August 12, plaintiff went to the East Bay Hand Medical Center and was examined by Dr. Andrew J. Stein, M.D. (*id.* at 147–50). Dr. Stein's impression was bilateral carpal tunnel syndrome, left trigger thumb, and nonindustrial cervical spondylosis (*id.* at 149). He advised plaintiff she could work with restrictions of no lifting over five pounds, no repetitive forceful pinching, gripping or torquing with either arm, frequent breaks, and data entry and handwriting limited to four hours per day (*id.* at 150). On August 16, Dr. Stein administered a thumb injection which relieved plaintiff's pain, though triggering continued. Testing showed moderately severe bilateral carpal tunnel syndrome (*id.* at 147).

On August 27, plaintiff went to The Rhodes-Jacobs Chiropractic Corporation and was examined by Dr. Ruben Amezquita, D.C. (*id.* at 151–58). Dr. Amezquita diagnosed plaintiff as having cervical IVD displacement without myelopathy and sprain/strain of the cervical spine, right shoulder, and left thumb, elbow, and shoulder (*id.* at 157). He felt plaintiff was temporarily totally disabled but he was unable to comment regarding permanent residual disability (*id.* at 158).

On September 9, plaintiff consulted Dr. Eduardo Lin, M.D. (*id.* at 183–88). Dr. Lin conducted an electromyogram study which confirmed Dr. Stein's finding of bilateral carpal tunnel syndrome (*id.* at 188).

On September 10, plaintiff returned to The Rhodes-Jacobs Chiropractic Corporation and was treated by Dr. Randolph Paul Rhodes, D.C. (*id.* at 226). Plaintiff continued to receive chiropractic care at this facility through January 2005 (*id.* at 189–30, 340–66).

On October 5, plaintiff underwent magnetic-resonance imaging of her cervical spine at the University of California at San Francisco Medical Center (*id.* at 231–34). The results showed mild degenerative disc disease (*id.* at 233).

On November 22, plaintiff returned to the office of Dr. Lin (*id.* at 180–82). Dr. Lin's examination found decreased cervical range of motion, tenderness to palpitation of multiple body sites including the elbows, writs and hands, positive Tinel, Phalen, and Tinkelstein tests, and medial and lateral epicodylar areas tender to palpation. He wrote that further treatment would be aggressive but conservative in nature. He prescribed Vioxx for inflammation and pain, and Ultracet for more severe pain. He recommended acupuncture, trigger point injection, and a thumb spica splint and wrist brace.

Dr. Lin saw plaintiff again on December 23 (*id.* at 178–79) and February 14 (*id.* at 175–77). In December, Dr. Lin diagnosed repetitive strain injury with bilateral carpal tunnel syndrome, De Quervain tenosynovitis, and lateral and medial epicondylitis. In February, Dr. Lin diagnosed repetitive strain injury with myofascial pain syndrome, bilateral carpal tunnel syndrome, and lateral and medial epicondylitis. His records indicate plaintiff continued to take Vioxx and Ultracet in conjunction with chiropractic management.

In May 2003, plaintiff underwent a consultation by Dr. Mathias Masem, M.D. (*id.* at 316–18). Dr. Masem's impression was bilateral carpal tunnel syndrome, bilateral wrist and forearm flexor tenosynovitis, bilateral elbow lateral epicondylitis and radial tunnel syndrome, and cervical strain (*id.* at 317). In November, Dr. Masem performed a left carpal tunnel and thumb flexor decompression. Dr. Masem's January 2004 records indicate plaintiff was healing well postoperatively, with residual symptoms and compensatory overuse in the right upper extremity (*id.* at 310).

6

From December 2003 through February 2004, plaintiff underwent hand therapy at NovaCare Rehabilitation (*id.* at 239-79). At the time of discharge, plaintiff was progressing toward treatment goals (*id.* at 249).

In April 2004, plaintiff was seen by consultative examiner Dr. Michael Murray, M.D. (*id.* at 235-38). Dr. Murray found positive Phalen's and compression tests and limited plaintiff to no excessive pulling, overhead activities, or prolonged repetitive activities, no lifting over twenty pounds, and no standing or walking over six hours (*id.* at 238).

In May 2004, Dr. Masem performed right carpal tunnel decompression and application of pain-control electrodes. Dr. Masem's pre and post-operative diagnoses were right carpel tunnel syndrome (*id.* at 292).

In June 2004, plaintiff resumed physical therapy at NovaCare (*id.* at 240–42). The final treatment status report issued the following month indicates plaintiff had demonstrated progress with her grip strength and range of motion, but that she fatigued very easily (*id.* at 241).

In June and July 2004, Dr. Masem's records indicate plaintiff was healing well postoperatively (*id.* at 288, 282). His September records found full range of motion of the cervix and of the hand and wrist, apart from pain with left lateral bending and rotation to the right, tightness in the right upper trapezius, crepitus with motion of the shoulder, and pain with full forward elevation and with supraspinatus loading (*id.* at 388). His October examination found minimal tenderness over the A1 pulley of the flexors, with no crepitation and full motion, very slight bilateral palmar wrist tenderness and full hand and wrist motion, cervical pain with lateral bending and tenderness over the trapezius bilaterally (*id.* at 386). He noted plaintiff's pain level did not correspond to her physical examination with the exception perhaps of her neck. He recommended plaintiff seek the services of a pain management doctor (*id.* at 387).

In November, Dr. Masem diagnosed plaintiff as residually symptomatic and injected plaintiff with Corticosteroid with some relief of her symptoms (*id.* at 384). In December, Dr. Masem found tenderness over the A1 pulley of the right thumb and actual locking of the thumb interphalangeal joint with thumb flexion, slight bilateral palmar wrist tenderness and full hand and wrist motion, persistent cervical spine pain with lateral bending and tenderness over

7

1  the trapezius bilaterally (*id.* at 382). In January, Dr. Masem diagnosed plaintiff as residually
2  symptomatic from right thumb flexor tenosynovitis (*id.* at 380). In March, Dr. Masem
3  performed a right thumb flexor decompression and application of pain control electrodes (*id.* at
4  376). In April, plaintiff resumed physical therapy at the request of Dr. Masem. She continued
5  the therapy through August 2005 (*id.* at 391–27).

6  In May 2005, Dr. Masem diagnosed plaintiff with flare-up of bilateral wrist tendonitis,
7  with improved thumb motion (*id.* at 373). Three weeks later he found plaintiff was healing well
8  postoperatively with exacerbation of cervical spine complaints (*id.* at 372). In June, Dr. Masem
9  noted plaintiff was progressing well with residual neck pain (*id.* at 371, 395). She experienced
10 pain only upon lifting heavy objects and was able to perform most tasks in her home (*id.* at 452,
11 473). Dr Masem rendered a final examination of plaintiff in August, describing her condition
12 as medically stable and precluding bilateral repetitive manipulation only (*id.* at 368–70).

13 In September 2005, Dr. Stephen Dell, M.D. prepared a "Qualified Medical Examiner
14 Report" (*id.* at 508–26). He diagnosed bilateral carpal tunnel syndrome status post
15 decompression, right thumb base deformity (possibly de Quervain's) status post decompression,
16 and cervical radiculopathy and strain/sprain on findings of mildly positive Phalen's and Tinel's
17 signs and decreased range of motion in the neck. Dr. Dell also found plaintiff's pinch and grip
18 strength were within normal limits. He concluded that, while plaintiff could not perform her
19 past job, she was a "medically feasible candidate" for vocational rehabilitation with an ability to
20 perform work not involving repetitive manipulation with either hand, repetitive use of the arms,
21 heavy work, twisting, torquing, or repetitive wrist motions, or work at or above shoulder level
22 with the right upper extremity.

23 **4.   THE ALJ'S ANALYSIS.**

24 An ALJ evaluates disability claims using a five-step inquiry. 20 C.F.R. 404.1520. In the
25 first four steps, the burden of proof lies with the claimant. *Andrews v. Shalala*, 53 F.3d 1035,
26 1040 (9th Cir. 1995). Based upon the claimant's proffered proof, the ALJ must determine:
27 (i) whether the claimant is working; (ii) the medical severity and duration of the claimant's
28 impairment; (iii) whether the disability meets any of those listed in Appendix 1, Subpart P,

8

Regulations No. 4; and (iv) whether the claimant is capable of performing his or her previous job.  20 C.F.R. 404.1520(a)(4)(i)–(iv).  In step five, "the burden shifts to the Secretary to show that the claimant can engage in other types of substantial gainful work that exists in the national economy."  *Andrews*, 53 F.3d at 1040.  This last step involves a determination of whether the claimant is capable of making an adjustment to other work.  20 C.F.R. 404.1520(a)(4)(v).  If the ALJ chooses to use a vocational expert to make this determination, hypothetical questions asked "must 'set out all of the claimant's impairments.'"  *Lewis v. Apfel*, 236 F.3d 503, 517 (9th Cir. 2001) (internal citation omitted).

Here, the ALJ found at step one of the sequential evaluation process that plaintiff had not engaged in substantial gainful activity since her alleged onset date of September 23, 2002 (AR 20).  At step two, the ALJ found plaintiff suffered from medically determinable impairments, diagnosed as "bilateral carpal tunnel syndrome (status post bilateral decompression surgeries), repetitive stress injury, and right thumb de Quervain's tenosynovitis (status post surgery)."  The ALJ found such impairments to be "severe" (*ibid.*).  The ALJ found plaintiff's reports of pain and diminished range of motion in her neck to be non-severe (*id.* at 20 n.1).  At step three, the ALJ found that none of plaintiff's impairments, considered separately or cumulatively, met or equaled any of the impairments listed in the Social Security regulations (*id.* at 20).

The ALJ next determined plaintiff's residual functional capacity, finding that at all relevant times she retained the capacity to lift and carry twenty pounds occasionally and ten pounds frequently, stand or walk six hours of an eight-hour workday with normal breaks, do no more than frequent overhead reaching or handling, do no repetitive movement with either upper extremity, and do no more than frequent pushing and pulling (*id.* at 21).  At step four, the ALJ found plaintiff was precluded from performing her past relevant work by her medically determinable impairments (*id.* at 24).  At step five, the ALJ found plaintiff was able to perform work existing in significant numbers in the local and national economies, as delineated by the vocational expert in his testimony at the administrative hearing (*id.* at 22–23).  Accordingly, the ALJ found plaintiff was not disabled within the meaning of the Social Security Act (*id.* at 23).

9

Plaintiff now argues the ALJ failed to: (i) accurately reflect the medical evidence; (ii) properly evaluate her reported cervical neck strain as a severe impairment; (iii) properly credit her testimony; (iv) properly assess her residual functional capacity; and (v) pose a legally adequate hypothetical to the vocational expert.

**ANALYSIS**

A decision denying disability benefits must be upheld if it is supported by substantial evidence and free of legal error. *Andrews*, 53 F.3d at 1039. Substantial evidence is "more than a scintilla," but "less than a preponderance." *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996). It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Ibid.* The Court must "review the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion." *Andrews*, 53 F.3d at 1039. "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities;" thus, where the evidence is susceptible to more than one rational interpretation, the decision of the ALJ must be upheld. *Ibid.*

For the following reasons, this order finds that neither the ALJ nor the Appeals Council erred in the decision to deny benefits to plaintiff.

**1. THE ALJ ACCURATELY REFLECTED THE MEDICAL EVIDENCE.**

Plaintiff maintains the ALJ failed to accurately reflect the medical evidence including the opinions of her treating and examining physicians. Specifically, plaintiff contends the ALJ failed to reflect: Dr. Stein's August 2002 opinions regarding plaintiff's residual functional capacity; Dr. Amezquita's August 2002 determination that plaintiff was temporarily totally disabled; Dr. Lin's November 2002 request that plaintiff wear a thumb splint and wrist brace; Dr. Masem's May 2003 opinion that plaintiff's condition had not responded to conservative treatment and that her bilateral carpal tunnel syndrome would not improve without surgery; Dr. Murray's April 2004 opinion that plaintiff needed breaks every two hours in an eight-hour work day, and; Dr. Dell's September 2005 finding that plaintiff was precluded from repetitive neck motions.

Plaintiff's assertion of error on these counts lacks merit. *First*, in interpreting the evidence and developing the record the ALJ need not discuss every piece of evidence. *Howard ex rel. Wolff v. BARNHART*, 341 F.3d at 1012. *Second*, the ALJ did discuss the opinions of these physicians. He cited to, *inter alia*, Exhibits 1F, 2F, 4F, 75, 9F, and 14F of the administrative record issued, respectively, by Dr. Stein in August 2002, Dr. Amezquita in August 2002, Dr. Lin between September 2002 and February 2003, Dr. Murray in April 2004, Dr. Masem between May 2003 and August 2004, and Dr. Dell in September 2005. *Third*, the opinions of these physicians were consistent with the ALJ's ultimate determination that plaintiff could not perform her past work. *Fourth*, with respect to the August 2002 opinions of Dr. Stein and Dr. Amezquita, even had the ALJ accorded them little weight, he would have been justified in so doing as they predated plaintiff's alleged onset date of disability. The ALJ did not err in his reflection of the medical evidence.

### 2. THE ALJ PROPERLY ASSESSED PLAINTIFF'S REPORTED NECK IMPAIRMENT.

Plaintiff asserts the ALJ failed to properly evaluate her reported cervical neck strain as a severe impairment. In support of this assertion, plaintiff cites several portions of her medical records assessing her reported neck and shoulder pain. For example, plaintiff contends: "Dr Stein stated that any overhead work, reaching at or above chest height, awkward neck movements, or sustained overhead work with lifting, would aggravate and accelerates symptoms of cervical spondylosis" (Br. 21). This is a mischaracterization of the record. In fact, Dr. Stein wrote that plaintiff complained of arm and neck pain, that cervical spondylosis had not been documented but would, in any event, be considered nonindustrial and, moreover, that plaintiff's job *did not* "involve any overhead work, reaching at or above chest height, awkward neck movements, or sustained overhead work with lifting, which could aggravate or accelerate symptoms of cervical spondylosis" (AR 149).

That plaintiff alleged a neck impairment does not mean the ALJ had to find it severe. Instead, the burden was on plaintiff to prove medically-severe impairments substantially limiting her ability to work. *Andrews*, 53 F.3d at 1040. Furthermore, in evaluating plaintiff's proffered

11

proof, the ALJ need not have accepted any physician's opinion, regardless of whether it was contradicted. *See Batson v. Comm'r of Soc. Sec.*, 359 F.3d 1190, 1194-95 (9th Cir. 2004).

Here, the ALJ assessed plaintiff's subjective reports and her physician's opinions and cited substantial evidence to support his conclusion that the claimed functional limitations were at most de minimis. In particular, the ALJ acknowledged plaintiff's reported neck pain and diminished range of motion, but noted that a magnetic resonance imaging of plaintiff's cervical spine in October 2002 showed only mild degenerative disc disease, an examination of plaintiff's cervical degenerative disc disease in April 2002 again showed it to be only mild and without radiculopathy, and a diagnosis in September 2005 found plaintiff's strain or sprain would cause no limitations on work. The ALJ did not err in his finding at step two of the sequential evaluation process.

### 3. THE ALJ'S DISCOUNTING OF PLAINTIFF'S TESTIMONY HAD A LEGITIMATE BASIS.

Plaintiff takes issue with the ALJ's conclusion that he could accord little weight to her report of subjectively experienced symptoms. Plaintiff asserts the ALJ reached this conclusion without a legitimate basis. Plaintiff is mistaken.

In rejecting a plaintiff's allegations of disabling symptoms, the ALJ must give specific, clear and convincing reasons. *Thomas v. BARNHART*, 278 F. 3d 947, 959-60 (9th Cir. 2002). The ALJ is responsible for determinations of credibility; thus, where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be upheld. *Andrews*, 53 F.3d at 1039.

In support of his finding that plaintiff's testimony was not fully credible, the ALJ pointed to the following evidence: treating physician Dr. Masem's express finding in November 2004 that plaintiff's reported subjective symptoms were inconsistent with the objective findings; medical records indicating plaintiff recovered quickly from each surgery, was able to tolerate pain with relatively minor medications, and experienced only limited periods of decreased grip strength; and plaintiff's acknowledgment at the administrative hearing that she no long had thumb symptoms and engaged in activities including cooking, computer keyboarding and, with her husband's assistance, grocery shopping and laundry (AR 22). It was within the ALJ's

authority to interpret this evidence as grounds for discrediting plaintiff's testimony of subjective symptoms. He did not err in so doing.

### 4. THE ALJ PROPERLY ASSESSED PLAINTIFF'S RESIDUAL FUNCTIONAL CAPACITY.

Plaintiff asserts that in determining her residual functional capacity, the ALJ ignored crucial limitations assessed by her treating and examining physicians including her need for breaks every two hours of an eight-hour workday and her inability to perform work requiring repetitive motions of the neck. She maintains the ALJ also rejected her testimony regarding her chronic pain, manipulative limitations, and therapeutic need to use "machines, electrodes" three times a day for fifteen-to-twenty minute intervals and to perform hand exercises throughout the day.

Regarding plaintiff's need for periodic rest breaks, this is not inconsistent with any job. As noted by defendant, Social Security Ruling 96-9p provides that "[i]n order to perform a full range of sedentary work, an individual must be able to remain in a seated position for approximately 6 hours of an 8-hour workday, with a morning break, a lunch period, and an afternoon break at approximately 2-hour intervals." Regarding plaintiff's reported neck problems, the ALJ did not ignore these limitations. Rather, as discussed above, the ALJ appropriately found at step two that they did not constitute a medically determinable severe impairment. Regarding plaintiff's subjective testimony, the ALJ did not improperly reject plaintiff's accounts. Rather, as noted earlier, the ALJ articulated specific, clear and convincing reasons for discrediting plaintiff's accounts and acted within his authority to interpret the evidence as grounds for so doing. Failing to include these limitations in the analysis of plaintiff's residual functional capacity was not error.

### 5. THE ALJ POSED A LEGALLY ADEQUATE HYPOTHETICAL.

Plaintiff contends that the hypothetical posed by the ALJ to the vocational expert was faulty, that the vocational expert's answers were hence of no evidentiary value and that, therefore, the ALJ's ultimate determination that she was not disabled was in error. Plaintiff grounds her contention on an assertion that the hypothetical omitted plaintiff's need for periodic breaks, her neck pain, and her chronic pain impacting her ability to perform sustained work

13

1  activity. Just as the omission of these limitations in the analysis of plaintiff's residual

2  functional capacity was not in error, their omission from the hypothetical was likewise proper.

3  In hypotheticals posed to a vocational expert the ALJ must only include those limitations

4  supported by substantial evidence. *Robbins v. Social Sec. Admin.*, 466 F.3d 880, 885 (9th Cir.

5  2006). Because the ALJ's hypothetical included all of the limitations that he found credible

6  and supported by substantial evidence in the record, the hypothetical was properly posed.

7       Plaintiff also faults the ALJ for "avoiding the problem" of plaintiff's limited English

8  by finding her to be "moderately fluent" (Br. 29). This finding, however, was inconsistent

9  with neither the vocational expert's testimony nor the ALJ's ultimate determination in reliance

10 thereon. Plaintiff testified to her ability to read and write only some English words (AR 553).

11 The vocational expert thus stated plaintiff was "monolingual" and unable to "deal with the

12 public" (*id.* at 572). The vocational expert factored this stated limitation into his answer to the

13 final hypothetical. The ALJ relied upon this answer in finding jobs available to plaintiff in the

14 local and national economies.

15      Lastly, plaintiff asserts the ALJ erred by failing to inquire of the vocational expert

16 whether his testimony conflicted with the Dictionary of Occupational Titles. This assertion is

17 inaccurate. In fact, the ALJ directed the vocational expert to alert him when giving titles of

18 jobs that conflicted with those in the Dictionary of Occupational Titles (*id.* at 567). That the

19 vocational expert followed this instruction is evidenced by his qualification of plaintiff's ability

20 to perform certain jobs with the phrase "but not the way it's performed in the DOT" (*id.* at 569).

21 The ALJ's questioning of and reliance upon the vocational expert were not in error.

14

**CONCLUSION**

For the foregoing reasons, plaintiff's motion for summary judgment is **DENIED** and defendant's cross-motion for summary judgment is **GRANTED**. Judgment will be entered accordingly.

**IT IS SO ORDERED.**

Dated: October 2, 2008.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE